**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CARMEN ATTANASIO, LYNN MARIE POTOSKI, and DENISE GAITERI, on their own behalf and for all others similarly situated, | CIVIL ACTION NO. 3:11-CV-582 |
| Plaintiffs, | (JUDGE CAPUTO) |
| COMMUNITY HEALTH SYSTEMS, INC., WYOMING VALLEY HEALTH CARE SYSTEM and WILKES-BARRE HOSPITAL CO., LLC, | |
| Defendants. | |

## MEMORANDUM

Presently before the Court is the Defendants' Motion to Dismiss (In Part) the Amended Complaint. (Doc. 25.) In their Amended Collective Action Complaint, Plaintiffs allege two categorical violations of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201, *et seq*. Defendants allege: (1) that Defendant Community Health Systems, Inc. should be dismissed as its employer status has not been properly plead; and (2) that off-the-clock uniform maintenance work cannot support a FLSA claim. Since a uniform maintenance can support a FLSA claim, Defendants' Motion will be denied in that respect. However, because the Plaintiffs have not properly pleaded that Community Health Systems is an employer under the FLSA, that Defendant will be dismissed and Plaintiffs will be afforded one further opportunity to amend their Complaint.

## BACKGROUND

Plaintiffs Carmen Attanasio, Lynn Marie Potoski, and Denise Gaiteri ("Plaintiffs")

bring this Amended Collective Action Complaint[1] pursuant to the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201, *et seq*.  They allege that Defendants Community Health Systems, Inc., Wyoming Valley Health Care System, and Wilkes-Barre Hospital Co., LLC ("Defendants"), and all of the Pennsylvania health care systems and hospitals under Defendants' control, violated the FLSA by failing to compensate their employees for the time they spent working during meal breaks and on required maintenance of their uniforms. (Am. Compl. at ¶ 1, Doc. 1.)

At all pertinent times, all three of the named Plaintiffs worked as registered nurses at the Wilkes-Barre General Hospital.  (*Id.* at ¶¶ 5, 6, 7.)  All three specifically allege that between March 28, 2008 and April 30, 2009, they worked for Wilkes-Barre Hospital Co., LLC ("WBHC") and the Wyoming Valley Health Care System ("WVHCS").  (*Id.*)  WVHCS is alleged to have been "Northeastern Pennsylvania's leading health care delivery network, employing more than 3,000 people" (*Id.* at ¶ 9), and WBHC was apparently "a wholly-owned subsidiary or affiliate of WVHCS that shared responsibility for the operation and management of Wilkes-Barre General Hospital . . . with more than 2,000 employees" (*Id.* at ¶ 10).  On April 30, 2009,  WVHCS was acquired by Community Health Systems, Inc. ("CHS") and its wholly-owned subsidiary or affiliate, Wilkes -Barre Holdings, LLC.  (*Id.* at ¶ 9.)  Therefore, from that date on,[2] the Plaintiffs also allege to have been employed by CHS.

---

[1]The Fair Labor Standards Act provides for such collective action: "An action to recover . . . may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).

[2]Plaintiffs Potoski and Gaiteri are apparently still registered nurses at Wilkes-Barre General Hospital, while it appears that Plaintiff Attanasio departed his position on July 15, 2011.  (Am. Compl. at ¶¶ 5-7.)

In Pennsylvania, CHS allegedly owns and operates "on its own or through its affiliates" entities employing more than 11,000 people "who, together, comprise the putative Class in this litigation." (*Id.* at p. 5, n.1.) Thus, to clarify, the putative class as between the dates of March 28, 2008 and April 29, 2009 would pertain only to WVHCS's 3,000 employees (and the lesser-included WBHC), while the putative class from class from April 30, 2009 to the present would include all 11,000 of CHS's Pennsylvania employees.

In their Amended Collective Action Complaint, Plaintiffs are seeking to assemble two subclasses to address two distinct violations by their employers.  The first proposed class is the  "meal break work sub-class."[3]  There, the Plaintiffs complain that while provided one unpaid meal break per shift, they were routinely forced to perform duties during this unpaid time. (*Id.* at ¶¶ 32-33.)  The Defendants were aware that this work was occurring because their "agents regularly encouraged, instructed, suffered and permitted Plaintiffs and the Class members to perform this work and observed this work being performed on a regular basis." (*Id.* at ¶ 34.)  Specifically, the named Plaintiffs aver that they were each required to work for roughly 95% of their meal breaks.  (*Id.* at ¶¶ 39-41.)  At their respective overtime rates, Plaintiffs Attanasio, Potoski, and Gaiteri are seeking $13,087, $14,763 and $15,290, respectively, for this meal break work. (*Id.*)

---

[3] "[T]he 'meal break work sub-class' is defined to include all Pennsylvania residents employed in hospital facilities owned or operated by Defendants, their subsidiaries, or their affiliated companies between March 28, 2008 and the present who were suffered or permitted to perform more than *de minimis* meal break work for Defendants' benefit, but who were not properly compensated for this work."  (Am. Compl. at ¶ 20(a), Doc. 24.) Instances of "more than *de minimus* meal break work" include, but are not limited to, "providing patient care and monitoring, administering medicine to patients, interacting with other hospital employees and visitors, monitoring blood-work and patient test results and responding to emergency situations."  (*Id.* at ¶ 21(a).)

The second class, styled as the "uniform maintenance work sub-class,"[4] complains that the "Defendants maintained policies and practices that required Plaintiffs and the Class members to maintain a professional appearance in the workplace" (*Id.* at ¶ 45), and that this was done outside of work as "Plaintiffs and the Class members were not permitted to perform the required uniform maintenance work at their assigned work locations or during their shifts." (*Id.* at ¶ 47.) As in the above meal break subclass, the Plaintiffs allege that the Defendants were aware of the maintenance being done outside of work as their "agents observed the results of this work on a regular basis." (*Id.* at ¶ 49.) Specifically, the named Plaintiffs aver that they were each required to "perform eight hours of off-the-clock uniform maintenance work each month." (*Id.* at ¶¶ 39-41.) At their respective overtime rates, Plaintiffs Attanasio, Potoski, and Gaiteri are seeking $11,700, $14,448 and $14,964, respectively, for their work maintaining their uniforms. (*Id.*)

Plaintiffs' Amended Complaint further seeks a list of names of potential Class members and the authorization to issue notice to those individuals. Moreover, Plaintiffs are seeking compensatory damages, pre-judgment interest, liquidated damages, attorney's fees and costs as well as equitable and injunctive relief. Plaintiffs claim that all named parties are members of both subclasses, and that all Plaintiffs and class members were subjected to the same meal break and uniform maintenance policies and systems. Plaintiffs believe

---

[4]"[T]he 'uniform maintenance work sub-class' is defined to include all Pennsylvania residents employed in hospital facilities owned or operated by Defendants, their subsidiaries, or their affiliated companies between March 28, 2008 and the present who were suffered or permitted to perform more than *de minimis* uniform maintenance work for Defendants' benefit, but who were not properly compensated for this work." (Am. Compl. at ¶ 20(b), Doc. 24.) Examples of this maintenance work include "washing, drying, ironing, spot cleaning and otherwise maintaining all of the components of [the] work uniform in good and presentable condition." (*Id.* at ¶ 21(b).)

the Class, "including both current and ex-employees over the relevant period, will include more than 5,000 people." (*Id.* at ¶ 23.)

Defendants have collectively moved to dismiss portions of the Amended Complaint as it fails to allege: (1) that CHS is an employer for purposes of the FLSA; (2) that WVHCS and WBHC are joint employers as to class members working outside the Wyoming Valley Health Care System[5]; and (3) a plausible claim as to the uniform maintenance subclass. The Defendants' Motion has been fully briefed and is ripe for the Court's review.

## DISCUSSION

### I. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. When considering a Rule 12(b)(6) motion, the Court's role is limited to determining if a plaintiff is entitled to offer evidence in support of their claims. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). The Court does not consider whether a plaintiff will ultimately prevail. *See id.* A defendant bears the burden of establishing that a plaintiff's complaint fails to state a claim. *See Gould Elecs. v. United States,* 220 F.3d 169, 178 (3d Cir. 2000).

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The

---

[5]Specifically, the Defendants seek to have the Amended Complaint dismissed insofar as it "can be read as alleging that the Wilkes-Barre Hospital Defendants, WVHCS and WBHC employed workers outside the Wyoming Valley Health Care System." (Def.'s Br. at 22, Doc. 26.) I do not find that the Amended Complaint alleges that these subsidiaries, through their parent, CHS, actually *employed* workers at the parent company's other Pennsylvania locations. Further, as Plaintiffs argue, it is unnecessary at this stage to address the issue of WBHC and WVHCS employees who have since migrated to CHS's other locations.

statement required by Rule 8(a)(2) must give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Detailed factual allegations are not required. *Twombly,* 550 U.S. at 555.  However, mere conclusory statements will not do; "a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).  Instead, a complaint must "show" this entitlement by alleging sufficient facts. *Id.*  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

As such, the inquiry at the motion to dismiss stage is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

Dismissal is appropriate only if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, meaning enough factual allegations "'to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element, *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an

6

entitlement to relief." *Id.* at 1950.

In deciding a motion to dismiss, the Court should consider the allegations in the complaint, exhibits attached to the complaint, and matters of public record. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). The Court may also consider "undisputedly authentic" documents when the plaintiff's claims are based on the documents and the defendant has attached copies of the documents to the motion to dismiss. *Id.* The Court need not assume the plaintiff can prove facts that were not alleged in the complaint, *see City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 & n.13 (3d Cir. 1998), or credit a complaint's "'bald assertions'" or "'legal conclusions,'" *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997)).

## II. Analysis

### A.   Failure to Allege CHS as an Employer

Plaintiffs allege that from the day CHS acquired WVHCS it has "owned and operated" WVHCS and WBHC and therefore "has been an 'employer' of Plaintiffs and the Class members as defined by the FLSA, 29 U.S.C. §203(d)." (Am. Compl. at ¶ 8, Doc. 24.) The Defendants retort that CHS has been implicated with "boilerplate allegations" that are "nothing more than 'a formulaic recitation of the elements of a cause of action.'" (Def.s' Br. at 14, Doc. 26 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).)  In particular, Defendants find it insufficiently plausible from the allegations in the Amended Complaint that CHS, as a Tennessee corporation, oversaw the "daily working conditions of more than 11,000 employees at thirteen health care facilities scattered throughout the Commonwealth." (*Id.* at 16.)

The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. § 203(d), and an "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1).  Courts have afforded these definitions a broad reading, in part to "further[] the remedial purposes of the FLSA." *Cavallaro v. UMass Memorial Health Care Inc.*, No. 09-40152, 2011 WL 2295023 at *3 (D.Mass June 8, 2011) (citations omitted).  An employee may have multiple employers for FLSA purposes, and depending on the particular facts, those employers may be jointly responsible for compliance with the Act's provisions.   29 C.F.R. § 791.2(a); *Davis v. Abington Memorial Hosp.*, --- F.Supp.2d ----, Nos. 09–5520, 09–5533, 09–5548, 09–5549, 09–5550, 09–5551, 2011 WL 4018106 at *3 (E.D. Pa. Sept. 8, 2011) ("A joint employment relationship can exist when employers are not "completely associated" with respect to the employment of individuals, or where one employer is controlled by another, or the employers are under common control.").   Similarly, individual companies can also be grouped together as a single-employer for the purposes of the Act where they are "so interrelated that they constitute a single employer." *Id.* at *3 (citing *Torres–Negron v. Merck & Co., Inc.*, 488 F.3d 34, 41 (1st Cir. 2007)).   In any event, determining the existence of such a joint employment relationship considers the "'real economic relationship' between the employee, employer, and putative joint employer." *Lepkowski v. Telatron Mktg. Group*, 766 F. Supp. 2d 572, 577 (W.D. Pa. 2011) (citation omitted).

In certain instances, FLSA liability can be shared between a parent corporation and its subsidiary–"[l]iability for violating an employee's rights under FLSA has attached to a parent corporation for the acts of a subsidiary when the parent substantially controls the terms and conditions of employment at its subsidiary on a regular basis." *Lehman v. Legg*

*Mason, Inc.*, 532 F. Supp. 2d 726, 733 (M.D. Pa. 2007) (citing *Falk v. Brennan*, 414 U.S. 190, 195 (1973)).  However, "'[t]he doctrine of limited liability creates a strong presumption that a parent corporation is not the employer of its subsidiary's employees,' and '[o]nly evidence of control suggesting a significant departure from the ordinary relationship between a parent and its subsidiary' is sufficient to establish a joint employer relationship." *Enter. Rent-A-Car Wage & Hour Empl. Practices Litig. v. Enter. Rent-A-Car Co.* (*Enterprise*), 735 F. Supp. 2d 277, 338 (W.D. Pa. 2010); *Lowenstein v. Catholic Health East*, --- F.Supp.2d ----, Civ. Act. No. 11-4689, 2011 WL 5069396 (E.D. Pa. Oct. 26, 2011) ("It is well settled that a parent corporation, like any stockholder, is not normally liable for the wrongful acts . . . of a subsidiary even if or simply because the parent wholly owns the subsidiary." (internal quotation and citation omitted)); *Bosley v. Chubb Corp.*, No. Civ. A. 04CV4598, 2005 WL 1334565 at *5 (E.D. Pa. June 3, 2005) (holding that "a parent corporation is not, under normal circumstances, liable as the employer of its subsidiaries' employees.").

The Third Circuit has not specified the determinative factors in this analysis, *Enterprise*, 735 F. Supp. 2d at 338, although courts in other circuits[6] have applied the integrated enterprise test, "a standard by which courts may essentially pierce the corporate veil for purposes of establishing employer liability in labor and employment law cases." *Perez-Benites v. Candy Brand, LLC*, No. 1:07–CV–1048, 2011 WL 1978414 at *11 (W.D. Ark. May 20, 2011).  That test considers, as between the parent and the subsidiary, any:

---

[6]The Third Circuit has, however, acknowledged the application of the integrated enterprise test to FLSA matters.  *Pearson v. Component Technology Corp.*, 247 F.3d 471, 486 (3d Cir. 2001).

"(1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control." *Id. Bosley v. Chubb Institute* endorsed such an approach, holding that in order to implicate the parent corporation in a FLSA overtime claim, the plaintiffs would have to add facts suggesting a "vertical enterprise." 516 F. Supp. 2d 479, 483 n.3 (E.D. Pa. 2007). Further, *Enterprise* applied a very similar set of factors in determining, at the summary judgment stage, that the parent company was not a joint employer. 735 F. Supp. 2d at 346. Those specific factors included the: "1) authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; 2) day-to-day supervision of employees, including employee discipline; and 3) control of employee records, including payroll, insurance, taxes and the like." *Id.* at 339 (quoting *Lewis v. Vollmer of America*, No. 05-1632, 2008 WL 355607 at *4 (W.D. Pa. Feb. 7, 2008)).

The economic realities of the instant matter direct the Court to analyze CHS as a parent corporation under the FLSA. In particular, the Amended Complaint pleads that "[d]uring the Class Period, through an array of wholly-owned subsidiaries or affiliates, CHS has owned and operated at least 13 hospitals or health systems in Pennsylvania." (Am. Compl. at ¶ 8, Doc. 24.) In the same apparent fashion, on April 30, 2009, "through its wholly-owned subsidiary or affiliate, Wilkes-Barre Holdings, LLC, CHS acquired the assets of [WVHCS], including [WBHC]." (*Id.*) By virtue of this ownership, the Plaintiffs state that CHS is "an 'employer' of Plaintiffs and the Class members as defined by the FLSA, 29 U.S.C. §230(d)." (*Id.* at ¶ 8.) This, however, is not automatically dispositive in the parent-subsidiary corporate arrangement, and a more detailed analysis of the employer-employee relationship is warranted. Of course, the pleadings relied on must present a "a 'showing'

10

rather than a blanket assertion of an entitlement to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).  And, "mere boilerplate allegations . . . without any supporting details–essentially 'a formulaic recitation of the elements of a cause of action'–are insufficient to raise plaintiffs' right to relief 'above a speculative level' with respect to that individual's liability as an employer." *Tracy v. NVR, Inc.*, 667 F. Supp. 2d 244, 247 (W.D.N.Y. 2009) (quoting *Twombly*, 550 U.S. at 555).

Resolving between formulaic recitations and factual showings is a detailed analysis. Squarely on the conclusory side of the spectrum are assertions that individual defendants exerted "'operational control' of the institutional defendants and [were] 'ultimately responsible' for ensuring their compliance with the FLSA." *Wright v. Lehigh Valley Hosp. & Health Network*, CIV. A. 10-431, 2011 WL 2550361 (E.D. Pa. June 23, 2011) (finding such statements "legal conclusions utterly devoid of any factual basis asserted to support the beliefs pled."). Missing from this were "rudimentary facts as specifying which proposed individual defendant controlled which institutional defendant, whether they had any specific role in each corporations' personnel, financial and compensation practices, and most importantly, whether they had any role in the corporations' alleged determination to compensate (or not compensate) its employees in accordance with the FLSA." *Id.* Similarly insufficient pleadings are exemplified in *Orosa v. Therakos* where the plaintiffs–in attempting to substantiate that the larger corporation was their indirect employer–included statements that a particular corporation had "exercised complete control over all material aspects" of the alleged subordinate corporation, and the conclusion that the smaller corporation was a "division" of the larger corporation.  No. C–11–2143 EMC, 2011 WL 3667485 at *5 (N.D. Cal. Aug. 22, 2011).  Again, these bald assertions presented too few

details as to the mechanics of the defendant's alleged control. *Id.* However, *Orosa* contrasted these infirm allegations against those that had been found sufficiently factual in a similar context, including statements that a defendant had "maintained control and authority, directly or indirectly, over all functions at other . . . entities," that the defendant "ha[d] the authority to create policies regarding compensation and hours," that "it ma[de] decisions concerning hiring and firing employees," and that the defendant "controlled plaintiffs' work schedules, rates and method of payment and benefits." *Id.* (quoting *Helm v. Alderwoods Group, Inc.*, 696 F. Supp. 2d 1057, 1073-79 (N.D. Cal., 2009)).

Such details are the backbone of a well-pleaded allegation. Specific averments, showing that a defendant has actually been involved in the conduct being used to implicate the employer-employee relationship, are necessary. For example, *Tracy v. NVR, Inc.* found that statements alleging the "general authority to hire and/or fire" and past maintenance of employee records were insufficient to implicate a company vice president as a FLSA defendants. 667 F. Supp. 2d 244, 247 (W.D.N.Y. 2009). These assertions lacked any "supporting details to substantiate their belief," namely any "facts concerning the extent of [vice president's] alleged involvement in [the company's] hiring and/or firing processes or record-keeping policies." *Id.* To the extent those plaintiffs argued that the alleged defendant had generally influenced control over their work schedules, conditions of employment, and compensation, this was also deemed inadequate "to raise plaintiffs' right to relief "above a speculative level.'" *Id.* (citing *Twombly*, 550 U.S. at 555). Finally, in the related context of employment discrimination, *McGehean v. AF&L Ins. Co.* held an assertion that a parent corporation "owned and operated [the subsidiary] or otherwise had direct control over [its] business" as factually devoid to support the requirement of "functional

12

integration of the operations of the parent and subsidiary, central control of labor relations, common management and common financial control." 2009 WL 3172763 at *4 (E.D. Pa. Oct. 02 2009). In particular, congruent with the matter *sub judice*, *McGehean* found it unclear "how AF & L, a Warminster, Pennsylvania based long-term care insurance policy provider, and CIVC, a Chicago, Illinois-based equity firm, would integrate their operations, centrally control their labor relations and share common management and financial control." *Id.*

In the Amended Complaint, the Plaintiffs argue that CHS and WBHC are together an integrated enterprise since CHS has the ability to:

> hire and fire Plaintiffs and all of the Class members; control the work performed by Plaintiffs and all of the Class members; direct the manner in which Plaintiffs and all of the Class members performed their work; inspect and supervise the work Plaintiffs and all of the Class members performed; promulgate policies and procedures (including the work, time, pay, overtime, appearance and uniform maintenance policies and procedures at issue here) governing the employment of Plaintiffs and all of the Class members; enforce these policies and procedures with respect to Plaintiffs and all of the Class members; and determine the pay given to Plaintiffs and all of the Class members.

(Am. Compl. at ¶ 18, Doc. 24.) As to the period prior to CHS's acquisition, the Amended Complaint alleges that WVHCS and WBHC had the exact same rights. (*Id.* at ¶ 17.) The Amended Complaint then also alleges that the Class members were "required to follow and abide by common work, time, pay, overtime, appearance and uniform maintenance policies and procedures in the performance of their jobs" (*Id.* at ¶¶ 14-15), and that "regardless of the hospital facility in which they worked, Plaintiffs and the Class members received wages from Defendants that were determined by common systems and methods that Defendants selected and controlled." (*Id.* at ¶ 16.)

As an initial matter, the above allegations from the Amended Complaint focus heavily on the first and third *Enterprise* factors–CHS's *authority* to dictate the terms of employment and the administration of employee records.  735 F. Supp. 2d at 339.  They do not, however, acknowledge the second factor, the "day-to-day supervision of employees."  *Id.* Although not alone dispositive, it is notable that no daily control is alleged.  However, even assuming that these allegations are sufficiently broad to upset the presumption that the parent corporation is not the employer of its subsidiary's employees, these particular recitations are conclusory and implausible.   First, Plaintiffs' allegations establishing employer control by WVHCS and later CHS are effectively identical.  This forecloses the possibility that these pleadings are particularized and demonstrates that these allegations are devoid of any actual factual support.  Yet, even beyond that these pleadings are boilerplate, is that there are no operative details suggesting exactly *how* CHS exercised authority over the particular employees, *how* these employees were supervised by a Delaware corporation headquartered in Tennessee acting through a holding company, and *how* they oversaw the administration of the business records.  As in the aforementioned cases, the Amended Complaint omits particularized assertions explaining the specific role CHS played in regard to the Plaintiffs within this administrative structure.  There are no supporting details as to the mechanics of CHS's actual involvement[7] as a parent corporation

---

[7]Further, the Plaintiffs include in the Amended Complaint several assertions that lump all three Defendants together, including that each day the Plaintiffs, and the Class members, "reported to a hospital facility owned, operated or managed by Defendants to perform their jobs," "toiled under the Defendants' supervision," and were "required to follow and abide by common work, time, pay, overtime, appearance and uniform maintenance policies and procedures in the performance of their jobs."  (Am. Compl. at  ¶¶ 13-15, Doc. 24.)  However, to the extent that the Plaintiffs make these assertions simultaneously as against all three Defendants, this impedes the analysis as to whether CHS, as the parent

that would raise Plaintiff's assertions above a speculative level.  Instead, Plaintiffs have

presented a list of relevant factors as fact without providing any detail to support that these

factors actually apply to the situation at hand.  This is especially notable where the

presumption is that CHS, as the parent company, is not Plaintiffs' employer.  From this,

Plaintiffs "have not nudged their claims across the line from conceivable to plausible."

*Twombly*, 550 U.S. at 570.

Plaintiffs have not sufficiently pleaded that CHS is an employer for the purposes of

the FLSA.[8]  However, the presumption that the parental corporation is not a FLSA employer

---

company, was actually an employer as envisioned by the FLSA.

[8]Plaintiffs further characterize CHS as an "indispensable party" as pursuant to
Federal Rule of Civil Procedure Rule 19.  Under Rule 19, a party is required to be joined, if
feasible, where:

> (A) in that person's absence, the court cannot accord complete relief among
> existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is
> so situated that disposing of the action in the person's absence may:
>> (i) as a practical matter impair or impede the person's ability to protect
>> the interest; or
>> (ii) leave an existing party subject to a substantial risk of incurring
>> double, multiple, or otherwise inconsistent obligations because of the
>> interest.

Fed. R. Civ. P. 19(a)(1).  Plaintiffs offer little argument on this point, but insist that "CHS is
a necessary party to Plaintiffs' suit given its direct, obvious and extensive ties to the
conduct alleged in Plaintiffs' Amended Complaint, as well as its direct financial interest in
the claims pending against its healthcare facilities."  (Pl.'s Br. at 7, Doc. 28.)  This is not
sufficient.  There is no direct assertion that complete relief cannot be accorded without the
inclusion of CHS.  *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 405
(3d Cir. 1993).  Nor, where CHS is affirmatively attempting to extricate itself from the case,
is there any need to "protect[] the person whose joinder is in question against the practical
prejudice to him which may arise through a disposition of the action in his absence."  Fed.
R. Civ. P. 19, Advisory Committee Notes, 1966 Amendment.  Finally, if a "direct financial
interest" were sufficient to retain the parent corporation as a necessary party, the joint

is not an irrefutable one, and where "a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile."  *Phillips v. County of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008) (citation omitted).  Therefore, I will afford Plaintiffs one further opportunity to amend their complaint solely to allege further detail as to the parent-subsidiary employment relationship in regard to CHS.

### B.    Viability of the Uniform Maintenance Subclass

The Defendants argue that uniform maintenance work cannot, as a legal matter, support a claim under the FLSA.

While the FLSA requires overtime compensation "for a workweek longer than forty hours," 29 U.S.C. § 207, it does not define the terms 'work' or 'workweek.'  *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 (2005).  Following the enactment of the FLSA, expansive judicial interpretations arose to fill in these terms, which  Congress then deemed to be in "disregard of long-established customs, practices, and contracts between employer and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation."  *Id.* at 26 (citing 61 Stat. 84).  As such, Congress amended the relevant portions of the FLSA with the Portal-to-Portal Act of 1947 (the "Act"), 29 U.S.C. § 251 *et seq.  Id.* In pertinent part, the Act provides that:

> [N]o employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended . . . on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for . . . activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or

---

employment tests outlined above would be pointless, which cannot be the case.

16

> subsequent to the time on any particular workday at which he ceases, such
> principal activity or activities.

29 U.S.C. § 254(a)(2).  The Supreme Court has held that this Act does not except activities

that "are an integral part of and are essential to the principal activities of the employees."

*Steiner v. Mitchell*, 350 U.S. 247, 254 (1956).  To the extent the Act was enacted to protect

employers from the unintended liability imposed by the courts, it was not designed to upset

the more traditional interpretations of the term "work."  *De Asencio v. Tyson Foods, Inc.*, 500

F.3d 361, 367 (3d Cir. 2007) (citing *Alvarez*, 546 U.S. at 28).  Thus, as the Plaintiffs point

out, the Act does not insulate employers from work they have reason to believe an

employee is performing, so long as that work is an integral part of and is essential to the

principal activities of the employee.[9]  *See* 29 C.F.R. § 785.13 ("In all such cases it is the

duty of the management to exercise its control and see that the work is not performed if it

does not want it to be performed. It cannot sit back and accept the benefits without

compensating for them.").  Conversely, "the fact that certain preshift activities are necessary

for employees to engage in their principal activities does not mean that those preshift

activities are 'integral and indispensable' to a 'principal activity.'"  *Alvarez*, 546 U.S. at 40.

---

[9]Plaintiffs argue that since they were required to meet certain uniform maintenance standards, their time spent conducting uniform maintenance could be considered by the Court as "part of their work day under the 'continuous workday rule.'"  (Pl.'s Br. at 19, Doc. 28.)  This is not the case.  A continuous workday is generally comprised of "the period between the commencement and completion on the same workday of an employee's principal activity or activities."  *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29 (2005) (citing 29 C.F.R. § 790.6(b)).  "The critical inquiries here are when and where the workday starts, for once it begins, the continuous workday rule applies and the Portal-to-Portal Act's exceptions for travel and preliminary activities are inapplicable."  *Gortat v. Capala Bros.*, 257 F.R.D. 353, 361 (E.D.N.Y. 2009).  Here, the Plaintiffs "were not permitted to perform the required uniform maintenance work at their assigned work locations or during their shifts."  (Am. Compl. at P. 47, Doc. 24.)  Therefore, it is not the case that the uncompensated activities Plaintiffs complain of were within the continuous workday.

Unfortunately, in interpreting what is integral and essential to the performance of a job, courts "have applied the *Steiner* definition inconsistently." *Albanese v. Bergen County*, 991 F. Supp. 410 (D.N.J. 1997).

In 1956, the Supreme Court held that butchers were entitled to compensation under the FLSA for knife-sharpening as that task comprised "an integral part of and indispensable to the various butchering activities for which they were principally employed." *Mitchell v. King Packing Co.*, 350 U.S. 260, 263 (1956). More recently, *Schwartz v. Victory Security Agency, LP*,[10] dismissed a FLSA claim–extremely similar to the instant matter–for uncompensated uniform maintenance and cleaning that took place outside of work, constituting approximately one to two hours each week. No. 11-cv-0489, 2011 WL 2437009 at *1 (W.D. Pa. June 14, 2011). In deciding whether such activity was "preliminary to or postliminary" as envisioned by the Act, that court determined that "if an activity is not essential to complete the employee's principal task the employee is not entitled to compensation for the activity pursuant to the Portal–to–Portal Act." *Id.* at *4 (quoting *Musticchi v. City of Little Rock*, 734 F. Supp. 2d 621, 631 (E.D. Ark. 2010)). Specifically, *Schwartz* held that even though the plaintiffs were "required to wear and therefore maintain their uniforms, such actions were not integral and indispensable to Plaintiffs' principal activity, providing security." *Id.* at *5.

---

[10]Defendants argue that *Schwartz* is not reliable precedent as Judge Schwab subsequently denied a motion for an interlocutory appeal on the matter, stating that *Schwartz* was "based upon the specific factual circumstances . . . and that such resultant findings would not contribute to the determination, at an early stage, of a wide range of cases." *Schwartz v. Victory Sec. Agency, LP*, No. 11-cv-04892011, U.S. Dist. LEXIS 69868 (W.D. Pa. June 29, 2011). This argument would be more persuasive if the operative factual circumstances at issue in *Schwartz* were not practically identical to those in the instant case.

Defendants also rely on *Musticchi v. City of Little Rock*, which held at summary judgment that time spent by police officers "polishing shoes, boots and duty belts, cleaning radios and traffic vests and oiling handcuffs are preliminary and postliminary activities and not compensable under the Portal-to-Portal Act." 734 F. Supp. 2d 621, 631 (E.D. Ark. 2010). In particular, that court reasoned that "[w]hile polishing and cleaning may be a necessary or an indispensable component of being a [police] officer, unlike a butcher sharpening a knife or an x-ray technician powering and testing an x-ray machine, [police] officers can successfully perform their jobs without polishing and cleaning their uniform and equipment." *Id. Musticchi* thus determined that "compensating Plaintiff for such activity would be contrary to Congress' intent pursuant to the Portal-to-Portal Act." *Id.* at 632. However, other cases have gone the opposite way on similar facts. *See Albanese v. Bergen County, N.J.*, 991 F. Supp. 410, 420-21 (D.N.J. 1997) (finding compensable and denying a motion to dismiss as to police officers' claims for "removing and polishing brass, washing uniforms, polishing shoes and other leather gear, and maintaining guns."); *Hellmers v. Town of Vestal*, 969 F. Supp. 837, 844 (N.D.N.Y 1997) (denying summary judgment in holding that off duty cleaning of a police vehicle and firearm were compensable under the FLSA as "an integral and indispensable part of the principal work activity").

The relevant cases cited by Defendants are generally inapposite to the instant matter. In *Valladon v. City of Oakland*, the analysis focused on whether time spent cleaning and maintaining police gear was *de minimus*, No. C 06-07478 SI, 2009 U.S. Dist. LEXIS 74439 at *16-20 (N.D. Cal. Aug. 21, 2009), and *Mory v. City of Chula Vista* considered whether police academy attendees were "not considered to be on duty" pursuant to 29 C.F.R. § 553.226 while they were preparing their uniforms, No. 07-cv-462 JLS (WVG), 2010

U.S. Dist. LEXIS 100777 at *21-25 (S.D. Cal. Sept. 24, 2010).   Moreover, although the plaintiffs in *Howard v. Securitas Security Services* alleged that "they spent time off-the-clock maintaining their uniforms to comply with Securitas's appearance requirements," that court only addressed whether those plaintiffs were similarly situated for the purposes of class certification.   No. 08 C 2746, 2009 U.S. Dist. LEXIS 3913 at *22 (N.D. Ill. Jan. 20, 2009). Plaintiffs' most compelling precedent, however, is *Marshall v. SF of Ohio, Inc.*. No. C-2-77-931, 1980 U.S. Dist. LEXIS 17825 (S.D. Ohio Feb. 1, 1980).   Marshall is not highly persuasive as it is a thirty-year-old unpublished, uncited decision from the District of Ohio. However, it is notable that *Marshall* interpreted Long John Silver's Seafood Shoppe's "distinctive 'crew costumes'" as "indispensable to communicating [a] marketing concept to the public," and that time spent laundering those uniforms was therefore compensable under the FLSA.  *Id.* at *18.

The above cases do not indicate that a uniform maintenance subclass would be inappropriate *per se*.   Instead, they are limited to their own facts and are not resolvable to any singular proposition.  Even the very recent and highly analogous precedent cited by the Defendants in *Schwartz* and *Musticchi* do not hold that uniform maintenance is inherently non-compensable, but that in those specific instances, the uniforms were not essential to the Plaintiffs' stated duties and were therefore not compensable under the FLSA as preliminary or postliminary activity.   Here, the Plaintiffs' principal work activities include "providing patient care and monitoring, administering medicine to patients, interacting with other hospital employees and visitors, monitoring blood-work and patient test results and responding to emergency situations."  (Am. Compl. at ¶¶ 5-7, Doc. 24.)  Further, Plaintiffs aver that they were required to maintain a professional appearance for ends including:

"clearly identifying themselves as hospital personnel; differentiating among different types of hospital staff and care providers; conveying their professionalism and competence; fostering the appearance of safety and security in their assigned work locations; and fostering morale and camaraderie among its employees." (*Id.* at ¶ 45.) Whether these uniforms are truly integral to these ends will ultimately dictate whether preliminary or postliminary[11] time spent maintaining these uniforms is compensable. This is a very difficult determination on these limited averments. Therefore, while ultimately a question of law, *Anderson v. Perdue Farms, Inc.*, 604 F. Supp. 2d 1339, 1349 (M.D. Ala. 2009), further factual development is warranted before it can be determined whether these uniforms are truly indispensable to nursing. The court holds that as a uniform maintenance class is not precluded as a matter of law, and the Defendants' Motion to Dismiss will be denied as to the uniform maintenance subclass.

### III. CONCLUSION

Since the Amended Complaint fails to plausibly allege Defendant Community Health Systems as an employer under the Fair Labor Standards Act, that Defendant will be dismissed from this action. Plaintiffs, however, will be given leave to amend the Amended Complaint to allege further facts as to Community Health System's employer status. Further, because uniform maintenance is potentially a compensable preliminary or

---

[11] Plaintiffs argue that uniform maintenance work is neither preliminary nor postliminary as it is not "either immediately before or immediately after the scheduled workday." Plaintiffs fail to offer, and the Court cannot find, any authority suggesting that either of these terms requires temporal immediacy. And, though it does not define postliminary, Black's Law Dictionary defines preliminary as merely "[c]oming before and usu[ally] leading up to the main part of something." Black's Law Dictionary 1299 (9th ed. 2009).

postliminary activity under the Fair Labor Standards Act, the Defendants' Motion to Dismiss as to this subclass will be denied.   An appropriate order follows.


 March 27, 2012                                               /s/ A. Richard Caputo
Date                                                      A. Richard Caputo
                                                         United States District Judge